HADLEY COHEN,                    §
                                 §
              Appellant,         §
                                 §
*versus*                         §     CIVIL ACTION NO. 1:13-CV-610
                                 §
THIRD COAST BANK, SSB,           §
                                 §
              Appellee.          §

## MEMORANDUM AND ORDER

Pending before the court is an appeal from a final judgment issued by the United States

Bankruptcy Court for the Eastern District of Texas disposing of the adversary proceeding initiated

by appellee Third Coast Bank, SSB ("Third Coast") against Appellant Hadley Cohen ("Cohen").

Having reviewed the record, the parties' briefs, and the applicable law, the court is of the opinion

that the bankruptcy court's decision should be affirmed.

I.     Background

This appeal concerns a judgment against Cohen in an adversary proceeding arising out of

his bankruptcy. The relevant facts in this case are undisputed.[1]

A.     Hadley Furniture's Beginnings

Hadley Furniture, Inc. ("HFI"), was a furniture retailer located in Beaumont, Texas.

Founded in 2001, it enjoyed steady sales growth during the first few years of its existence, due

in part to the heightened demand for replacement furniture caused by Hurricanes Rita and Ike.

Cohen managed HFI, served as its president, and owned 49% of HFI's stock. His spouse,

---

[1] The bankruptcy court's findings of fact, which serve as the basis for this court's factual background, are contained in Docket No. 5. The findings can also be viewed at *Third Coast Bank, SSB v. Cohen (In re Cohen)*, No. 12-10027, 2013 WL 4079369, at *2 (Bankr. E.D. Tex. Aug. 13, 2013).

Melinda Cohen ("Mrs. Cohen"), owned the remaining 51% of HFI's stock and was listed as the company's treasurer. Despite her title, Mrs. Cohen exercised little, if any, control over HFI's financial affairs.

The Cohens also controlled a related entity named Kobee Investments, LLC ("Kobee"), which owned property on Calder Avenue in Beaumont (the "Calder Property"). HFI leased the Calder Property from Kobee for use as warehouse facilities.

For the first eight years of its existence, HFI and the Cohens had an exclusive banking relationship with Wachovia Bank, N.A. ("Wachovia").[2] HFI had a revolving line of credit secured by all of its assets, which consisted primarily of accounts receivable and inventory. HFI also executed a promissory note in favor of Wachovia to finance improvements to the Calder Property (the "HFI-TI Loan"). The HFI-TI Loan was likewise secured by all of HFI's assets. Separately, Kobee had executed two promissory notes in favor of Wachovia that were secured by the Calder Property.

B.     The Refinancing of Real Estate Indebtedness

In 2009, Cohen and Scott Adams ("Adams"), an officer at Third Coast, began discussing the possibility of creating a banking relationship between HFI and Third Coast. Adams was familiar with HFI's operations because he had previously worked as a loan officer with Wachovia and had done some business with HFI. Adams eventually convinced Cohen to refinance Kobee's real estate indebtedness.[3]     Kobee borrowed $1,600,000.00 from Third Coast pursuant to a

_____

[2] For the sake of simplicity, the court will use the term "Wachovia" to refer to all of Wachovia's predecessors- and successors-in-interest.

[3] Kobee was created at or near the time the Kobee loan was executed. Before 2009, the Cohens owned the Calder Property, which served as HFI's primary place of business. The Cohens later sold their real estate interest in the Calder Property to Kobee, which was formed to serve as a holding company for

2

Commercial Real Estate Note (the "Kobee Loan"), which obligation was secured by a deed of trust and other security instruments. HFI and the Cohens also executed an unlimited guaranty in favor of Third Coast to secure payment of the amounts due under the Kobee Loan. After the Kobee Loan closed, two checks were issued in the amounts of $908,977.71 and $234,382.69 to pay off the two promissory notes that Kobee owed Wachovia.

After deducting the amounts of the two checks and closing costs, $446,755.64 of the original $1,600.000.00 that Kobee borrowed from Third Coast remained. This excess was not unintentional. Rather, Third Coast expected that HFI and the Cohens would use the extra funds to pay down the amount it owed on the HFI-TI Loan, thereby further weakening HFI's banking relationship with Wachovia.[4] Instead of paying down the debt, however, the Cohens deposited the $446,755.64 in a personal account at Merrill Lynch. They later used $400,000.00 of those funds to purchase a certificate of deposit (the "CD") from Third Coast, which was unaware of the source of the funds used to make the purchase.

C.      The Establishment of the HFI Credit Line

After the refinancing of Kobee's debt was complete, discussions continued between Cohen and Adams about moving HFI's lending relationship from Wachovia to Third Coast. Initially, Third Coast offered a revolving credit facility in the amount of $1,900,000.00, but Cohen thought that amount was insufficient for HFI's needs. After further negotiations, the parties agreed to

---

those real estate assets. It was only after those transactions that Kobee refinanced its newly-acquired indebtedness with Third Coast. *See* Docket No. 9, pp. 201, 219; Docket No. 10, p. 38.

[4] As the bankruptcy court noted, "[i]t is ironic that [Third Coast] apparently expected Cohen to engage in conduct of which it now complains—the diversion of the retained assets of one entity (Kobee) for the benefit of another entity (HFI)—an act that could be construed as one in contravention of the best interests of Kobee and its creditors."

establish a credit facility for HFI, consisting of a revolving line of credit in the amount of $2,600.000.00 (the "HFI Credit Line"). The higher amount was agreed to only after Cohen agreed to pledge the $400,000.00 CD.

The HFI Credit Line was documented by a promissory note and a security agreement, both signed by Cohen in his capacity as president of HFI. The security agreement specified that the HFI Credit Line was secured by all of the assets of HFI. Cohen also executed a personal guaranty of the payment of HFI's indebtedness to Third Coast. Moreover, the Cohens pledged their CD which, as noted above, was purchased with the excess funds from the Kobee Loan, as collateral for the HFI Credit Line. During this transaction, Third Coast was under the erroneous impression that the money used to purchase the CD had instead been used to pay off the HFI-TI Loan.

In addition to the note and security agreement, the parties executed a Business Loan Agreement (the "Agreement") that further defined their lending relationship. The Agreement explained that the HFI Credit Line was an asset-based loan under which Third Coast would advance funds to HFI based on the value of a "borrowing base," which was defined as the lesser of: (1) $2,600,000.00; or (2) the sum of 75% of HFI's eligible accounts receivable plus 50% of HFI's eligible inventory. Advances of funds to HFI could be made under the HFI Credit Line provided that the aggregate amount of those advances outstanding at any time did not exceed the borrowing base. Thus, if the value of HFI's collateral decreased, the amount of money HFI could borrow from Third Coast would decline as well.

Cohen made several representations in the Agreement concerning the collateral for the HFI Credit Line. He stated that the security interests being granted to Third Coast were "authorized, created, and perfected with first lien priority." In discussing lien priority, the Agreement stated:

"Unless otherwise previously disclosed to [Third Coast] in writing, [HFI] has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of [HFI]'s Loan and Note, that would be prior or that may in any way be superior to [Third Coast]'s Security Interests and rights in and to such Collateral."

Further, Cohen agreed that HFI would maintain its books in accordance with Generally Accepted Accounting Principles ("GAAP") and that its financial reports to Third Coast would be prepared pursuant to GAAP and certified as true and correct.

Despite making these representations, Cohen had not ensured that HFI's original HFI-TI Loan with Wachovia was paid off by the time the HFI Credit Line was created. Thus, Wachovia still had a security interest in all of HFI's assets superior to those of Third Coast, a fact which Cohen failed to disclose at the time he entered into the Agreement. Moreover, Cohen failed to disclose other important details when securing the HFI Credit Line, including the existence of an additional lien held by Parkdale Mall in several of HFI's assets and the fact that he had previously filed for bankruptcy in 1998.

The bankruptcy court found that Cohen's failure to disclose the existence of these lien interests was intentional, not inadvertent, and motivated by a desire to obtain the increased line of credit offered by Third Coast. As the bankruptcy court noted, Cohen "candidly admitted" at trial that he knew, at the time he entered into the Agreement, that his representation that Third Coast's security interest in HFI's assets had first priority was false. Further, the bankruptcy court found that Third Coast would not have advanced loan proceeds pursuant to the HFI Credit Line had Cohen not misrepresented HFI's financial condition.

D.    Cohen's Continued Misrepresentations

Cohen's misrepresentations did not end once the HFI Credit Line was established.  The parties renewed the HFI Credit Line on three occasions:  in October 2010, January 2011, and May 2011.  While the maximum amount of credit available to HFI was reduced each time, the documentation surrounding each renewal was nearly identical to that of the first.  Cohen continued to represent falsely that Third Coast's security interest had first priority when, in fact, HFI's assets were encumbered by other, superior security interests.  Cohen also engaged in other questionable practices between 2009 and 2011.  He began to divert cash from HFI to cover his personal expenditures, chiefly through the use of HFI's American Express account.  He also granted additional liens on HFI's assets to certain vendors.

Moreover, Cohen submitted false documentation about HFI's financial status to Third Coast, including not only false financial statements but also false borrowing base certificates.  As discussed above, the total line of credit available to HFI depended on the value of its accounts receivable and inventory.  Pursuant to the parties' Agreement, Cohen was required to submit borrowing base certificates detailing the current value of those assets.  These certificates allowed Third Coast to oversee the credit line and ensure that it did not advance more money to HFI than permitted under the Agreement.  If a certificate revealed that the amount of funds advanced to HFI under the credit line exceeded the borrowing base, Third Coast could immediately demand repayment in order to bring the loan bank into compliance.

The following are the amounts of accounts receivable and total inventory reflected in the eight certificates submitted by HFI:

| Date of Borrowing Certificate | Accounts Receivable Balance | Total Inventory |
|---|---|---|
| June 1, 2011 | $1,474,797.84 | $2,451,336.01 |
| April 11, 2011 | $1,958,044.72 | $2,688,555.45 |
| February 22, 2011 | $1,724,050.92 | $2,586,084.57 |
| December 31, 2010 | $1,272,027.77 | $2,436,481.63 |
| September 15, 2010 | $1,496,861.20 | $2,597,764.44 |
| May 1, 2010 | $1,366,884.00 | $2,577,158.56 |
| March 16, 2010 | $   835,816.60 | $2,649,898.52 |
| December 31, 2009 | $1,201,238.70 | $2,496,828.79 |

The information in the certificates proved to be highly inaccurate. For instance, while the June 2011 certificate indicated an inventory value of $2,451,336.01, an independent appraisal, conducted only three months later, determined that the actual value was a mere $897,151.20. As the bankruptcy court found, HFI had not conducted an actual physical inventory count since the last quarter of 2004, and Cohen compromised the accuracy of internal financial reporting by counting items of furniture sold on credit as both accounts receivable and inventory.

Cohen submitted these documents to Third Coast despite certifying, each time he tendered a certificate, the following:

> The undersigned hereby certify that (a) the information and calculation set forth above are true, complete and correct as the dates indicated, and may be relied upon by Bank as a basis for advancing any credit to Borrower, (b) such computations have been made in full compliance with the terms of the Loan Agreement, (c) the representations and warranties of Borrowers under the Loan Agreement are true and correct as of the date first set forth above, and (d) no default or event of default has occurred under the Loan Agreement or any of the documents, instruments or agreements executed in connection therewith.

As the evidence cited above demonstrates, Cohen's certifications were largely untrue.

On January 10, 2012, the Cohens filed a joint bankruptcy petition.[5]  On February 24, 2012, after the meeting of creditors was held in the Cohens' bankruptcy, Third Coast timely filed its complaint objecting to the dischargeability of the amounts owed under the HFI Credit Line.  Adversary No. 12-1004.   Third Coast's complaint sought to except its claim from the scope of any discharge of indebtedness granted to the Cohens in their bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).   The bankruptcy court conducted a trial on the adversary proceeding and issued findings of fact and conclusion of law.  Docket No. 5.  The bankruptcy court concluded that Cohen's debt to Third Coast was nondischargeable because, among other things, Cohen:  (1) falsely represented that Third Coast's liens on HFI's property had first priority; (2) submitted false information in the borrowing base certificates; (3) failed to disclose diversions of corporate assets; and (4) failed to disclose that he had previously filed for bankruptcy.  *See* § 523(a)(2)(A).  The court did not, however, find Mrs. Cohen responsible for any wrongdoing, nor did it find that Cohen inflicted willful and malicious injury against Third Coast as required by § 523(a)(6).

On August 13, 2013, the bankruptcy court entered a final judgment disposing of Third Coast's adversary proceeding against Cohen.  *See* Docket No. 4.  The court ordered that Third Coast recover from Cohen $1,989,141.57 with post-judgment interest to accrue at a rate of 0.12% per annum.  The court also declared the debt to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  All other relief was denied.  Cohen filed a notice of appeal from the bankruptcy court's judgment on October 8, 2013.

---

[5] HFI filed for chapter 7 bankruptcy relief on August 29, 2011.

F.    Issues Presented on Appeal

In his appellate brief, Cohen discusses six issues[6] on appeal, only three of which are truly distinct:  (1) Whether the bankruptcy court had authority, under Article III of the Constitution, to issue a final judgment on Third Coast's false misrepresentation claim under § 523(a)(2)(A); (2) Whether the bankruptcy court properly concluded that Third Coast "justifiably relied" on Cohen's misrepresentations; and (3) Whether the bankruptcy erred in concluding that the borrowing base certificates did not constitute a "statement respecting the debtor's . . . financial condition."

II.    Analysis

A.    Standard of Review on Bankruptcy Appeals

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges.  28 U.S.C. § 158(a).  Pursuant to 28 U.S.C. § 158(c)(2), an appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts . . . ."  *Id.*  Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court."  *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir.

---

[6] Cohen lists the issues presented on appeal as follows: (1) whether the bankruptcy court had the constitutional authority to enter its money judgment against him; (2) "whether the bankruptcy court properly applied to the facts of the case the 'justifiable reliance' element of the fraud interpretation announced by the Supreme Court . . . ."; (3) whether the bankruptcy court is "required to account for the knowledge of [Third Coast] and its loan officer to determine the need for due diligence and/or investigation; (4) "Did the Bankruptcy Court properly take in to account the subjective knowledge of [Third Coast] in determining its justifiable reliance"; (5) "Did the Bankruptcy Court properly apply the standard of 'other than the debtor's . . . financial condition'. . . ."; and (6) "Are the borrowing base certificates a statement of the debtors [sic] or an insider's financial condition."  Questions (3) and (4) are logically subsumed into question (2), while question (6) is merely a corollary of question (5).

1992); *accord Perry v. Dearing (In re Perry)*, 345 F.3d 303, 308-09 (5th Cir. 2003); *In re S. White Transp., Inc.*, 473 B.R. 695, 698 (S.D. Miss. 2012), *aff'd*, 725 F.3d 494 (5th Cir. 2013).

In reviewing a decision of the bankruptcy court, Rule 8013 of the Federal Rules of Bankruptcy Procedure requires the court to accept the bankruptcy court's findings of fact unless clearly erroneous and to examine *de novo* the conclusions of law. *See In re Halo Wireless, Inc.*, 684 F.3d 581, 586 (5th Cir. 2012); *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008); *Texas v. Soileau (In re Soileau)*, 488 F.3d 302, 305 (5th Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008). Mixed questions of law and fact are reviewed *de novo*. *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 557 (5th Cir. 2009). A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *See Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006); *see also In re Perry*, 345 F.3d at 309 (quoting *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003)).

B.     The Power of the Bankruptcy Court to Issue its Final Judgment

Under 28 U.S.C. § 1334, district courts have original, but not exclusive, jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a), bankruptcy proceedings are divided into three categories: (1) those that "aris[e] under title 11"; (2) those that "aris[e] in" a title 11 case; and (3) those that are "related to a case under title 11." 28 U.S.C. § 157(a). Under § 157, district courts may refer all such proceedings to the bankruptcy judges of their district, who may then enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(a), (b)(1). Section 157(b)(2) lists sixteen categories of core proceedings,

including "determinations as to the dischargeability of particular debts." § 157(b)(2)(I). In non-core proceedings, a bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1). This adversary proceeding is a core proceeding pursuant to § 157(b)(2)(I).

For the first time on appeal, Cohen argues that the bankruptcy court's final adjudication of Third Coast's false misrepresentation claim in the underlying case was unconstitutional in light of the United States Supreme Court's decision in *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011). In *Stern*, the Court discussed a bankruptcy court's constitutional authority to enter final orders on certain core matters. 131 S. Ct. at 2606-20. The *Stern* case involved protracted litigation over the estate of Texas oil tycoon J. Howard Marshall ("Marshall") between the estates of his surviving spouse, Vickie Lynn Marshall, better known as Anna Nicole Smith ("Vickie"), and E. Pierce Marshall, Marshall's son ("Pierce"). *Id.* at 2601.

Shortly before Marshall's death, Vickie filed suit in a Texas probate court alleging that Pierce fraudulently induced his father to sign a living trust agreement excluding Vickie from receiving any portion of Marshall's estate. *Id.* The Texas court rejected Vickie's claim, ruling in favor of Pierce. *Id.* at 2601-02. With her state action pending, Vickie filed for bankruptcy protection in the Central District of California. *Id.* Pierce then filed a complaint and proof of claim in the bankruptcy court alleging that Vickie had defamed him. *Id.* at 2601. Vickie responded with a counterclaim seeking damages for Pierce's alleged tortious interference with Marshall's promise to give Vickie a large portion of his property. *Id.*

Following a bench trial, the bankruptcy court ruled in favor of Vickie, awarding her compensatory and punitive damages. *Id.* On appeal, the United States Court of Appeals for the

Ninth Circuit held that the bankruptcy court lacked authority to enter judgment on Vickie's counterclaim, finding that the counterclaim, based solely on state law, was not a core proceeding. *Id.* at 2602. The Supreme Court affirmed the Ninth Circuit on different grounds, concluding that, while the bankruptcy court had the statutory authority to issue a final judgment on Vickie's counterclaim because it was a "core" proceeding under the plain text of § 157(b)(2)(C) (stating that core proceedings include "counterclaims by the estate against persons filing claims against the estate"), it lacked the constitutional authority to decide the state law counterclaim. *Id.* at 2604-20.

Importantly, although the Supreme Court held that the bankruptcy court lacked the constitutional authority to adjudicate Vickie's counterclaim, it noted that the bankruptcy court did have subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(C). *See Stern*, 131 S. Ct. at 2607. The Court explained that the allocation of authority set forth in § 157 "to enter final judgment between the bankruptcy court and the district court . . . does not implicate questions of subject matter jurisdiction." *Id.*; *accord In re Refco, Inc.*, 461 B.R. 181, 184 (Bankr. S.D.N.Y. 2011) (rejecting the notion that *Stern* disturbs a bankruptcy court's subject matter jurisdiction over core matters); *In re Soporex, Inc.*, 463 B.R. 344, 362 n.4 (Bankr. N.D. Tex. 2011) ("*Stern* clarified bankruptcy courts' constitutional power, not their subject matter jurisdiction."); *In re Universal Mktg., Inc.*, 459 B.R. 573, 577 (Bankr. E.D. Pa. 2011) ("*Stern* does not affect the exercise of federal bankruptcy jurisdiction. . . ."); *In re Wilderness Crossings, LLC*, Adv. No. 11-80417, 2011 WL 5417098, at *1 (Bankr. W.D. Mich. Nov. 8, 2011) (same).

The Supreme Court, in a five-to-four decision, asserted numerous reasons for its holding that the bankruptcy court lacked the constitutional authority to adjudicate Vickie's counterclaim. As noted by Justice Scalia's concurring opinion:

there are at least seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this lawsuit: that it was one "under state common law" which was "not a matter that can be pursued only by grace of the other branches," *ante*, at 27; that it was "not 'completely dependent upon' adjudication of a claim created by federal law," *ibid.*; that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings," *ibid.*; that "the asserted authority to decide Vickie's claim is not limited to a 'particularized area of the law,'" *ante*, at 28; that "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim," *ante*, at 32; that the trustee was not "asserting a right to recovery created by federal bankruptcy law," *ante*, at 33; and that the Bankruptcy Judge "ha[d] the power to enter 'appropriate orders and judgments'—including final judgments—subject to review only if a party chooses to appeal," *ante*, at 35.

*Stern*, 131 S. Ct. 2621.

In Cohen's view, *Stern* prohibits bankruptcy courts from issuing final judgments and liquidating restitution amounts for claims asserted under § 523(a)(2)(A). Cohen, however, fails to recognize key differences between *Stern* and the instant case. Unlike *Stern*, this case involves a claim brought by a creditor, not a debtor. Also, Third Coast's § 523(a)(2)(A) claim is a creature of federal law, not of state or common law. Furthermore, determining the dischargeability of a debt, unlike adjudicating a state law counterclaim, is a "fundamental part of the bankruptcy process." *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011), *aff'd sub nom. Carroll v. Farooqi*, 486 B.R. 718 (N.D. Tex. 2013). "The Supreme Court has never held that bankruptcy courts are without Constitutional authority to hear and finally determine whether a debt is dischargeable in bankruptcy. In fact, the Supreme Court's decision in *Stern* clearly implied that bankruptcy courts have such authority when it concluded that bankruptcy courts had the Constitutional authority to decide even state law counterclaims to filed proofs of claim if the counterclaim would necessarily be decided through the claims allowance process."

*Id. Stern* is therefore inapposite because, unlike the state law counterclaim at issue in that case, the dischargeability of a debt under § 523(a)(2) is a necessary component of the claims allowance process.

Moreover, the Fifth Circuit has held that bankruptcy courts have the authority to enter a final money judgment when determining the dischargeability of creditors' claims in bankruptcy. *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479-80 (5th Cir. 2009). At this time, *Morrison* remains binding precedent that has not been overruled by *Stern*. *See, e.g.*, *Drexel Highlander Ltd. P'ship v. Edelman (In re Edelman)*, No. 12-31182-BJH, 2014 WL 1796217, at *2 (Bankr. N.D. Tex. May 6, 2014); *Jacobsen v. Sramek*, No. 4-11-CV-822, 2013 WL 694045, at *3-4 (E.D. Tex. Feb. 26, 2013).

In any event, the Supreme Court has clarified that if a bankruptcy court adjudicates a "*Stern* claim," *i.e.*, a core matter that cannot, per the Constitution, be finally determined by a bankruptcy court, a bankruptcy court can issue findings of fact and conclusions of law for *de novo* review by the district court. *Executive Benefits Ins. Agency v. Arkison*, No. 12-1200, ___ S. Ct. ___, 2014 WL 2560461, at *3 (June 9, 2014).[7] In *Arkison*, even though the bankruptcy court did not submit findings of fact or conclusions of law, the district court conducted a *de novo* review of the claims that were appealed and issued a separate final judgment. *Id.* at *9. Here, Cohen's appeal addresses only legal questions and mixed questions of law and fact, both of which are reviewed *de novo*. *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d at 557. Thus, any

---

[7] In *Arkison*, the Supreme Court assumed, without deciding, that a fraudulent conveyance claim against a noncreditor was a "*Stern* claim." slip op. at 11.

14

possible constitutional issues presented by this appeal could be cured by issuing a separate final judgment.

Accordingly, the bankruptcy court had the authority to enter its final judgment and to liquidate the amount of Cohen's nondischargeable debt to Third Coast. In any event, if the bankruptcy court did not have that authority, this court can cure any procedural defect by issuing its own final judgment.

C.    Characterization of the Borrowing Base Certificates

Title 11, U.S.C. § 523, creates several categories of debts that are nondischargeable in bankruptcy. Subsection 523(a)(2) provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit is not dischargeable if obtained either by: "(A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*; or (B) use of a statement in writing, (i) that is materially false, (ii) respecting the debtor's or an insider's financial condition, (iii) on which the creditor whom the debtor is liable for such money, property, services, or credit reasonably relied, and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2) (emphasis added). Thus, subsection 523(a)(2)(B) governs misrepresentations contained in written statements concerning a debtor's financial condition, while subsection 523(a)(2)(A) governs other misrepresentations.

Here, the parties dispute whether the "borrowing-base certificates" Cohen provided to Third Coast constitute "statements respecting a debtor's . . . financial condition" under § 523(a)(2). The Fifth Circuit established the test for determining what constitutes a "statement

respecting a debtor's . . . financial condition" in *Bandi v. Becnel*, 683 F.3d 671 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 845 (2013).

*Bandi* involved a dispute about the dischargeability of debt acquired through fraud and misrepresentation. *Id.* at 673. To obtain financing for their business, the Bandis sought and received a line of credit from an individual named Becnel. *Id.* In order to obtain the loan, the Bandis provided Becnel with fraudulent accounts receivable lists and falsely represented ownership of various properties, which together overstated their company's financial stability. *Id.* A few months after the line of credit was acquired, the company folded, and the Bandis, who had personally guaranteed the line of credit, filed for bankruptcy. *Id.*

The Bandis and Becnel disagreed as to whether the bankruptcy court should have analyzed the Bandis' statements under § 523(a)(2)(B) or § 523(a)(2)(A). *Id.* at 673-74. While both subsections address debtor misrepresentations, § 523(a)(2)(B) imposes a stricter standard of reliance on creditors by requiring them to demonstrate that they *reasonably* relied on a debtor's false misrepresentations. Subsection (A), on the other hand, requires only that a creditor's reliance be justifiable. Ultimately, the bankruptcy court held that the Bandis' misrepresentations were not statements respecting their financial condition because they did not pertain to the company's "overall financial condition." *Id.*

The Fifth Circuit upheld the bankruptcy court's interpretation of § 523, concluding that subsection 523(a)(2) was meant to encompass "terms commonly understood in commercial usage rather than a broadly descriptive phrase intended to capture any and all misrepresentations." *Id.* at 676. The court defined the term "financial condition" as the "overall value of property and income as compared to debt and liabilities." *Id.* Among the examples of statements concerning

a debtor's financial condition provided by the Fifth Circuit were: balance sheets, income statements, statements of change in overall financial position, or income and debt statements that present the debtor's or insider's net worth or overall financial health. *Id.* at 675. Ultimately, the court held that the Bandis' statements, which disclosed only accounts receivable and falsified property ownership, were not statements regarding the debtor's overall financial condition. *Id.* at 676. The court reasoned that those representations revealed nothing about the debtors' ability to pay back the debt or their other liabilities. *Id.*

Here, the court finds that Cohen's borrowing base certificates are not "statements of a debtor's . . . financial condition." This precise issue was presented in *Buckeye Ret. Co. v. Kakde (In re Kakde)*, 382 B.R. 411, 418 (Bankr. S.D. Ohio 2008). There, the borrowing base certificates contained detailed accounts receivable and inventory reports. *Id.* The *Kakde* court concluded that the "borrowing-base certificates" were not statements of the overall financial condition, however, because they did not include the debtor's other assets such as machinery, equipment, vehicles, or other substantial liabilities. *Id.* at 422.

In another case, *In re Thomas*, the court concluded that borrowing base certificates were, in fact, "statements of overall financial condition." *Bank of Bennington v. Thomas (In re Thomas)*, No. A07-8014-TJM, 2009 WL 3068754, at *1 (Bankr. D. Neb. Sept. 21, 2009). In its analysis, however, the court found it relevant that the certificates listed the value of several classes of assets, including inventory, state tax stamps, accounts receivable, cash on hand, and other miscellaneous assets of the debtor. *Id.*

*Thomas* is distinguishable from the instant case. While providing a glimpse (later disproven) of HFI's financial health, the certificates submitted by Cohen do not purport to reflect

the overall financial health of HFI. For instance, they do not list HFI's other assets such as equipment or cash on hand, nor do they provide any information about HFI's liabilities. Without those facts, the borrowing base certificates could not have revealed HFI's overall financial condition. Accordingly, the court finds that the borrowing base certificates were not statements respecting HFI's financial condition. Therefore, the bankruptcy court properly analyzed the nondischargeability of Cohen's debt under § 523(a)(2)(A), not § 523(a)(2)(B).

      D.    <u>Justifiable Reliance under § 523(a)(2)(A)</u>

Section 523(a)(2) makes nondischargeable "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The bankruptcy court found that Cohen obtained credit from Third Coast through false misrepresentations. For a debt to be nondischargeable because of a false misrepresentation, the creditor must demonstrate that: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance. *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

In the case at bar, the only disputed issue is whether Third Coast justifiably relied on Cohen's misrepresentations. "Justifiable reliance is an intermediate level of reliance. It is less than reasonable reliance, but more than mere reliance in fact." *Moss v. Littleton*, No. 3:01-CV-2260-L, 2002 WL 31156405, at *3 n.2 (N.D. Tex. Sept. 26, 2002) (citations omitted); *see also Field v. Mans*, 516 U.S. 59, 73 (1995). Reliance is justified "if its falsity is not ascertainable

upon a *cursory* examination or investigation." *Jacobson v. Ormsby (In Re Paul C. Jacobson)*, No. 04-51572-RBK, 2007 WL 1644346, at *12 (W.D. Tex. June 5, 2007) (citing *Field*, 516 U.S. at 71) (emphasis added). In other words, justifiable reliance does not impose a duty to investigate unless the falsity of the representation is readily apparent or obvious, or there are "red flags" indicating that reliance is unwarranted. *Moss*, 2002 WL 31156405, at *3 (citing *AT&T Universal Card Servs. v. Mercer (In Re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)).

Here, Cohen claims that Third Coast's reliance was unjustified because of the previous dealings its loan officer, Adams, had with HFI. Adams worked for Wachovia from 2005 until 2009, when he joined Third Coast bank. During his stint at Wachovia, Adams was aware that HFI had obtained loans from that institution. Indeed, Adams was HFI's and the Cohens' banker during that period, and he personally made the HFI-TI Loan that financed improvements to the Kobee properties. Cohen contends that this knowledge, which he asserts is legally imputed to Third Coast, constitutes a "red flag" that precludes any finding of justifiable reliance.

Cohen's argument is unpersuasive. Before establishing the HFI Credit Line, Adams had worked with Cohen to provide financing to Kobee. Their negotiations led to the execution of the Kobee Loan. Adams testified that he and Cohen had agreed that the $446,755.64 in excess proceeds from the Kobee Loan was to pay down the balances of other Wachovia loans owed by HFI. Cohen arguably acknowledged that understanding in an e-mail to Adams in which he confirmed that HFI's Wachovia debts had been paid off.[8]

---

[8] Although there is no copy of the e-mail in the record, Adams testified that he received an e-mail that was initially sent from Cohen to Will Leonard, a commercial lending officer at Wachovia. The e-mail stated that the HFI's entire banking relationship was transferred from Wachovia to Third Coast, thus implying that the HFI-TI loan was paid off. *See* Docket No. 9, pp. 41-42.

When the HFI Credit Line was established, Adams sought to confirm that HFI had satisfied its debts to Wachovia. He obtained that confirmation from Cohen, who stated that Third Coast's security interests in HFI's assets would have first priority. While Third Coast could have better protected its interests by conducting a lien search, it did not do so because Cohen falsely represented to Adams that no higher priority liens existed. As a result, Adams (and, by extension, Third Coast) reasonably inferred that the HFI-TI Loan had been paid. Adams did not perceive any "red flags" because Cohen told Adams there were none. Moreover, there is no other evidence that would have given Adams reason to distrust Cohen.

In essence, Cohen is arguing that Third Coast did not justifiably rely on his misrepresentations because the bank was lackadaisical in evaluating Cohen's creditworthiness. Cohen's characterization downplays the actions that Third Coast took to protect its interests, including obtaining a personal guaranty from Cohen, requiring him to submit borrowing base certificates, and requiring him to make several assurances in the loan agreement. Under these circumstances, Third Coast's reliance on Cohen's misrepresentations was not unjustified.

Even if the court were to accept Cohen's argument, it would preclude justifiable reliance only as to his misrepresentations of lien priority, not to the other misrepresentations he made during HFI and Third Coast's banking relationship. Indeed, the bankruptcy court based its nondischargeability determination not only on the undisclosed conflicting liens, but also on "the misrepresentations contained in the borrowing base certificates, . . . , the undisclosed diversions of corporate assets, Cohen's undisclosed bankruptcy filing in 1998, and other false financial information submitted to [Third Coast] by [Cohen] on behalf of HFI." Cohen does not contend

that the bankruptcy court erred in finding that Third Coast's reliance on those misrepresentations was justified.

In any event, several cases considering similar misrepresentations have found reliance upon them to be justified. For instance, in *In re Ledet*, the bankruptcy court found that a bank had justifiably relied on borrowing base certificates submitted by a debtor. *Whitney Nat'l Bank v. Ledet (In re Ledet)*, No. 99-3719, 2000 WL 278092, at *1 (E.D. La. Mar. 14, 2000). A company owned by Ledet, the debtor, had executed a promissory note in favor of the bank to establish a line of credit. *Id.* Available credit was limited to the value of a specified percentage of the company's eligible accounts receivable. *Id.* After Ledet filed for bankruptcy, the bank argued that his debt under the note was nondischargeable because he submitted false borrowing base certificates that referenced nonexistent accounts receivable. *Id.* The bankruptcy court found that the bank's reliance on the falsified certificates was justifiable because "nothing on the face" of the certificates "indicated that the supporting invoices were false," and the bank's cursory examination of the certificates did not reveal "any abnormality." *Id.* at *5.

A similar conclusion was reached in *Harris Bank Oakbrook Terrace v. Corrigan (In Re Corrigan)*, No. 01 B 12705, 2003 WL 261919, at *1 (N.D. Ill. Feb. 6, 2003). In that case, the bankruptcy court examined a bank's conduct under the more exacting reasonable reliance standard applicable to claims under § 523(a)(2)(B). *Id.* at *7. The bank had loaned the debtor money and required him to submit borrowing base certificates describing his accounts receivable and fixed assets. *Id.* at *2. Those certificates were found to have "painted a substantially untrue picture" of debtor's assets by, among other things, listing fixed assets that the debtor did not in fact own. *Id.* at *7. The bankruptcy court found that the bank "was reasonably entitled to rely upon the

financial information provided by the debtor because it had no reason to suspect that the debtor had falsified" the information. *Id*. at *12.

Courts have also found reliance to be justified in cases where, as here, a debtor misrepresents how he will use loan proceeds or fails to disclose a prior bankruptcy. *See Westwood Square Ltd. P'ship v. Broome (In re Broome)*, No. 11-50528-KMS, 2014 WL 61235, at *8 (S.D. Miss. Jan. 8, 2014) (finding that creditors justifiably relied on a debtor's representation that loan proceeds would be used to expand a restaurant); *Pagliero v. Lopez (In re Lopez)*, No. 09-1277-A, 2011 WL 10642952, at *3-5 (Bankr. E.D. Cal. May 18, 2011) (holding that reliance was justified on false representations, including debtor's failure to disclose her prior bankruptcy).

Thus, even if Adams's knowledge of Cohen's and HFI's prior loans precluded Third Coast from justifiably relying on Cohen's misrepresentation concerning lien priority, that circumstance would not foreclose Third Coast's justifiable reliance of his other admitted misrepresentations concerning the borrowing base certificates, his failure to disclose his prior bankruptcy, his failure to adhere to GAAP, and his diversion of corporate assets. Accordingly, the bankruptcy court correctly found that Third Coast justifiably relied on Cohen's misrepresentations in extending him credit under the HFI Credit Line.

III.   Conclusion

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED. The bankruptcy court had the constitutional authority both to issue a final judgment as to Third Coast's nondischargeability claim and to liquidate the amount of the claim. Further, the bankruptcy court properly analyzed Third Coast's claim under § 523(a)(2)(A) and correctly held that Third Coast

justifiably relied on Cohen's misrepresentations.  A final judgment will be entered separately by this court to avert any subsequent claims regarding the bankruptcy court's constitutional authority.

SIGNED at Beaumont, Texas, this 13th day of June, 2014.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE